UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
EDWARD SAUNDERS,                                                                        No. 1:20-cv-5805

                                  Plaintiff,

    -against-                                                                                         **COMPLAINT**

NEW YORK CONVENTION CENTER
OPERATING CORPORATION, d/b/a
JACOB K. JAVITS CONVENTION CENTER,                          Jury Trial Demanded
and the NEW YORK CITY DISTRICT COUNCIL
OF CARPENTERS,

                                 Defendants
-----------------------------------------------------------------X

Plaintiff EDWARD SAUNDERS, by and through his attorneys, the **DEREK SMITH LAW GROUP, PLLC,** as and for his Complaint in this action, alleges as follows upon information and belief:

## NATURE OF THE CLAIMS

1. This action is brought to remedy Defendants' unlawfully discriminatory and retaliatory harassment and termination of Plaintiff's employment, which violated 42 U.S.C. § 1981 as amended by the Civil Rights Act of 1991 ("Section 1981") and 42 U.S.C. § 1983 ("Section 1983").

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 in that the action involves federal questions arising under the above-mentioned federal statutes.

3. Venue is proper in this District based upon the fact that the events or omissions that give rise to the claims asserted herein occurred within the Southern District of New York.

1

**PARTIES**

4. Plaintiff is an African-American man.

5. At all times relevant to this Complaint, Plaintiff was employed as a journeyman carpenter by Defendant NEW YORK CONVENTION CENTER OPERATING CORPORATION, which does business as, and is generally known as, the JACOB K. JAVITS CONVENTION CENTER (hereinafter, the "JAVITS CENTER").

6. At all times material, the JAVITS CENTER has been a public benefit corporation and subdivision of New York State, created by New York law, for the purpose of operating and maintaining a large convention hall at 655 West 34th Street in Manhattan.

7. According to its website, the JAVITS CENTER'S mission is to "serve the citizens of the State and City of New York by generating new business and employment opportunities, serving as a catalyst for the continued redevelopment of the local community and operating in the public interest, consistent with the social, economic and environmental priorities of existing state policy."

8. According to its website, the JAVITS CENTER achieves this mission by "operating in accordance with the highest professional standards, generating sufficient operating revenue to be financially self-supporting, maintaining the convention center facility in accordance with our core values and ensuring our operations are consistent with contemporary sustainability objectives and a community friendly approach."

9. Featuring prominently in these above-mentioned "core values" are "Caring" and "Integrity" which, according to its own website, the JAVITS CENTER defines as caring "about the success of our colleagues, our community and our business partners" and requiring "high standards of ethics and conduct for our directors, officers and employees" respectively.

10. At all times relevant to this Complaint, Defendant NEW YORK CITY DISTRICT COUNCIL OF CARPENTERS (hereinafter referred to as the "CARPENTERS COUNCIL") has been a representative body comprised of nine individual local unions with over 20,000 members, headquartered at 395 Hudson Street in Manhattan.

11. According to its website, the CARPENTERS COUNCIL "functions as the voice for thousands of New York City's most dedicated and skilled Carpenters, Millwrights, Dockbuilders, Timbermen, Cabinetmakers, Floorcoverers and Industrial Workers."

12. One of the CARPENTERS COUNCIL member union locals is Local 157, of which Plaintiff was a member.

13. At all times material, the JAVITS CENTER employed or jointly employed David Maffia, a CARPENTERS COUNCIL member, as a carpenter and foreman.

14. At all times material, the JAVITS CENTER employed Marko Bulic, a CARPENTERS COUNCIL member, as a carpenter.

## FACTUAL ALLEGATIONS

15. In or around 1995, the JAVITS CENTER hired Plaintiff as an apprentice carpenter; as such, his duties included assembling and dismantling exhibition booths for convention center events.

16. Because the JAVITS CENTER is a "closed shop," Plaintiff was required to join the CARPENTERS COUNCIL in order to remain employed there.

17. Through his skill and competence, Plaintiff eventually worked his way up to the position of journeyman carpenter. Plaintiff was at all times a reliable, knowledgeable employee who performed all of his assigned duties promptly and properly.

3

18. Shortly after Plaintiff's hiring, he realized that JAVITS CENTER employees who were CARPENTERS COUNCIL members were subjecting him and other African Americans to unwanted and unwelcome discriminatory comments and conduct.

19. African-American employees were often confronted aggresively and "walked off of the floor" – sent home early for the day – if they were late in paying their union assessment fees, while white employees who were similarly late in paying their assessment fees were not similarly "walked off of the floor."

20. In 1998 Plaintiff complained to JAVITS management about being called "a monkey" while at work.

21. African-American employees who threatened to bring litigation against the JAVITS CENTER were terminated, while white employees who threatened litigation against the JAVITS CENTER were not similarly terminated.

22. African-American employees were also excluded from supervisory or managerial positions at the JAVITS CENTER.

23. African-American employees were also disproportionately disfavored for work assignments, and thereby targeted for reduced hours. For example, in 2015, Plaintiff was assigned to work over 150 hours less than in each of the prior two years. However, similarly situated white employees did not have their hours reduced to such an extent that year. In fact, Maffia's work hours increased by 70% during the same period.

24. Meanwhile, the CARPENTERS COUNCIL was consistently derelict in its avowed duty to provide fair representation to Plaintiff and other African Americans in the face of such discriminatory mistreatment, particularly during the internal grievance process.

25.     On or about September 17, 2015, Plaintiff arrived at the CARPENTERS' COUNCIL labor hall just in time to clock in by his 8:00 shift start. Plaintiff would normally arrive at work at least a few minutes early, but there had been a bad accident on the West Side Highway (the road Plaintiff used to get to work) that morning, and traffic had been much worse than usual. Several other employees were running late too, and Plaintiff had to wait several minutes in line to sign in. By the time he did, it was a few minutes after 8:00. Maffia, a union foreman, and the union's shop steward, who were all present, snatched the sign-in sheet off the table and refused to allow Plaintiff to sign. The white employees who were a few minutes late were allowed to sign in without a problem. Plaintiff had to return home without working that day; and worse, because that day marked the beginning of a trade show, and jobs are assigned for an entire show on its first day, Plaintiff was thus effectively prevented from doing any work at the convention center for the following week.

26.     On or about September 21, 2015, Plaintiff attempted to submit a formal written grievance about Maffia's racially discriminatory conduct on September 17 through Ditto, Plaintiff's shop steward. But Ditto later admitted during an administrative hearing, he never actually filed Plaintiff's grievance, and it was never addressed. Instead, Defendants immediately began subjecting Plaintiff to a campaign of adverse employment actions and hostility as a retaliatory response to this protected activity.

27.     By way of example, within days, the JAVITS CENTER dramatically reduced Plaintiff's assigned work hours.

28.     By way of further example, while Plaintiff had previously been periodically assigned as a "lead carpenter" (i.e., a foreman) on projects involving major convention booth contractors GES and Freeman, he was thereafter excluded from any further periodic assignments.

29. On or about October 1, 2015, McMAHON and JANNER met with Plaintiff to discuss his September 21 complaint. Immediately following this meeting, Defendants took active steps to increase their retaliatory campaign against Plaintiff.

30. As an example, in October 2015, the JAVITS CENTER demoted Plaintiff from his position as a supervisor.

31. As a further example, the JAVITS CENTER further reduced Plaintiff's work hours beginning that month.

32. As a further example, Maffia, with the assistance of the CARPENTERS COUNCIL, filed one or more formal grievances against Plaintiff, falsely claiming that Plaintiff's own grievances and complaints about September 17 were perjured and that Plaintiff should be expelled from the CARPENTERS COUNCIL.

33. As a result of Defendants' unlawful campaign of retaliation, on about January 30, 2016, Plaintiff filed a grievance against the JAVITS CENTER and CARPENTERS COUNCIL with the Public Employee Relations Board (hereinafter referred to as "PERB"). The case was eventually heard by an administrative law judge on March 28 and July 27, 2017. (It has since been withdrawn.)

34. While Plaintiff's PERB case was being litigated and *sub judice*, Defendants' campaign of retaliation continued.

35. In May or June of 2017, Plaintiff was instructed to take a test for a boom operator certification, which required operating a mobile boom while being evaluated by a supervisor. Plaintiff had already been operating a boom at work without a single problem for many years.

36. Shortly before Plaintiff began his testing, as he climbed into the boom's basket where its controls are located, the JAVITS CENTER safety coordinator responsible for

evaluating and grading the testees said: "so you're the troublemaker, huh?" The safety coordinator then rushed Plaintiff to operate the boom faster and faster, unlike any of the other testees. Nonetheless, Plaintiff operated the boom competently – successfully driving the boom around traffic cones without knocking any over in less time than anyone else tested that day.

37. Notwithstanding his good performance on the boom test, the supervisor gave Plaintiff a failing grade – Plaintiff was the only person tested not to pass. Thereafter, Defendants used this failure as an excuse to further reduce Plaintiff's assigned work hours – at a substantial loss of income – and to demote Plaintiff from a supervisory position to an apprentice position.

38. Additionally, during the period following Plaintiff's PERB litigation, his Plaintiff's car was repeatedly vandalized, and other white coworkers – particularly Steven Ramirez – repeatedly refused to work near Plaintiff, falsely accused him of leaving equipment in other workers' work areas, made racist jokes and comments in his presence, and called him a "rat."

39. Also in June 2017 Maffia and Bulic (another white supervisory employee), were operating a boom to position a large exhibition booth sign while Plaintiff walked nearby, in violation of Javits Center safety rules. They attempted to swing the sign and hit Plaintiff's head with the sign or the boom arm. Luckily, a coworker noticed and pushed Plaintiff out of the way. Plaintiff complained about the incident, and Defendants should have maintained security video footage of this incident. Ironically, while Plaintiff was disqualified from operating a boom despite his more than adequate work history and performance on the boom test, neither Maffia nor Bulic was penalized for their dangerous and improper boom operation.

40. On or about March 19, 2018, at about 1:11 p.m., as Plaintiff was working in his assigned section moving and putting away wall panels from exhibition booth displays, Maffia

and Bulic moved a lifting machine down the aisle and parked it directly in front of a crate into which Plaintiff was moving panels, deliberately obstructing it and preventing him from completing his work. Maffia and Bulic then proceeded to sit and talk idly by the lift; Plaintiff took a video of this incident on his smartphone.

41. Then, on or about March 26, 2018, at approximately 8:30 p.m., a contractor instructed Plaintiff to supervise putting fabric on walls in a display booth.

42. About twenty minutes later, Bulic approached Plaintiff and yelled aggressively: "THE NEXT TIME YOU FILM ME, YOU'RE GOING TO BE DEAD OUTSIDE!" His adrenaline racing, Plaintiff responded: "If you want to kill me now, why wait, let's go."

43. Fearing for his own safety, once Bulic left the area, Plaintiff decided to leave.

44. Plaintiff gathered his belongings and, accompanied by his Union delegate, went to a JAVITS CENTER representative in order to file a grievance report.

45. After filing his grievance report, on the way out of work, Plaintiff encountered BULIC, who taunted Plaintiff and attempted to instigate a fight with Plaintiff. However, Plaintiff walked away without engaging Bulic.

46. Nonetheless, the JAVITS CENTER informed Plaintiff via a telephone call several days later that he was being suspended without pay until further notice. Plaintiff called the CARPTENTER COUNCIL'S attorney, and told him what had happened. The attorney promised to look into the matter, but Plaintiff never heard back from him or anyone else at the CARPENTERS COUNCIL.

47. On or about April 11, 2018, the JAVITS CENTER terminated Plaintiff via formal letter, and also in a telephone call from its Human Resources specialist McMAHON.

48. Although the ostensible reason Plaintff was fired was that he had threatened BULIC during their March 26, 2018 confrontation, that is absurd. Bulic instigated the confrontation and threatened Plaintiff; even if Plaintiff responded in kind, it was self-evidently in the heat of the moment. Yet upon information and belief, BULIC was not fired or even disciplined for his role in the incident.

49. The only reasonable conclusion is that Plaintiff was terminated on the basis of his race or color, and in retaliation for his prior complaints about discriminatory disparate treatment and harassment.

50. The above are just some examples of the unlawful discrimination and retaliation to which Defendants subjected Plaintiff.

51. As a result of Defendants' unlawful and discriminatory actions, Plaintiff feels humiliated, degraded, victimized, embarrassed, and emotionally distressed, and has endured depression, anxiety, and physical ailments, and the exacerbation of preexisting conditions.

52. As a result of Defendants' unlawful and discriminatory actions, Plaintiff has also endured financial hardships and irreparable damage to his professional reputation, and has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits, and other compensation which such employment entails.

53. As Defendants' actions were malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands punitive damages against Defendants, jointly and severally.

54. Plaintiff's discharge was unlawful, and Plaintiff also seeks reinstatement.

55. Alternatively, in the event Defendants claim or the Court determines that Plaintiff is an independent contractor, Plaintiff makes all applicable claims for the above conduct and facts under the applicable law pertaining to independent contractors.

56. Plaintiff claims a continuous practice of discrimination and makes all claims herein under the continuing violations doctrine.

**FIRST CAUSE OF ACTION:**
**DISCRIMINATION UNDER 42 U.S.C. § 1981**
**(AGAINST DEFENDANT CARPENTERS COUNCIL)**

57. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

58. 42 U.S.C. § 1981 ("Section 1981"), titled "Equal rights under the law," provides:

(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

59. The CARPENTERS COUNCIL consistently enacted, applied, enforced, or participated in a purposefully discriminatory pattern and practice of harassing and depriving African-Americans, including Plaintiff, of their equal rights in violation of Section 1981, in particular by allowing or encouraging the Javits Center to terminate Plaintiff's employment.

60. The CARPENTERS COUNCIL particularly applied, enforced, or participated in such discriminatory practices against Plaintiff in retaliation for his prior complaints about such harassment and other deprivations of equal rights, further violating Section 1981.

61. As a result of the CARPENTERS COUNCIL'S discrimination and retaliation in violation of Section 1981, Plaintiff has been denied the enjoyment of all benefits, privileges, terms, and conditions of a contractual relationship.  In particular, Plaintiff has been denied his collectively-bargained employment at the JAVITS CENTER, which provided substantial compensation and benefits, and was also discriminatorily ejected from membership in Local 157 and the CARPENTERS COUNCIL, losing his union health insurance and pension benefits.

62. Plaintiff has also suffered considerable emotional distress and injury.

63. Plaintiff is thereby entitled to legal and equitable relief, particularly compensatory damages and reinstatement of his union membership, or at the very least restitution of the contributions he made to the various union pension, health, and welfare plans before being denied all benefits from such plans.

64. As alleged above, the CARPENTERS COUNCIL acted with malice or reckless indifference to Plaintiff's rights, thereby entitling Plaintiff to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**DISCRIMINATION UNDER 42 U.S.C. § 1983**
**(AGAINST DEFENDANT JAVITS CENTER)**

65. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

66. 42 U.S.C § 1983 ("Section 1983"), "Civil action for deprivation of rights," states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction

    thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

  67. The JAVITS CENTER consistently and continuously subjected Plaintiff to disparate terms and conditions of employment because of his race or in retaliation for his prior complaints about its racially discriminatory mistreatment, which culminated in the JAVITS CENTER'S termination of Plaintiff in March 2018.

  68. Such consistently and continuously discriminatory disparate terms and conditions also included, but are not limited to:

   a. physically intimidating Plaintiff and other African-American employees for overdue assessment fees;

   b. implementing and applying arbitrary and harassing disciplinary measures against Plaintiff and other African-American employees;

   c. disfavoring African-American carpenters in assignments and placement within leadership and supervisory positions;

   d. unfavorable treatment of black, African-American employees in assignments and placements within leadership and supervisory positions;

  69. All the foregoing actions were taken by the JAVITS CENTER in order to deprive Plaintiff and other African-American employees of employment and other contractual opportunities due to their race or color.

70. As a result of the JAVITS CENTER'S discrimination and retaliation in violation of Section 1983, Plaintiff has been denied the enjoyment of all benefits, privileges, terms, and conditions of his contractual relationship, which provided substantial compensation and benefits. Plaintiff has also suffered such anguish, humiliation, distress, inconvenience and loss of enjoyment of life because of the JAVITS CENTER'S actions. Plaintiff is thereby entitled to legal and equitable relief, particularly compensatory damages and reinstatement to his position at the JAVITS CENTER.

71. As alleged above, the JAVITS CENTER acted with malice or reckless indifference to the rights of the Plaintiff, thereby entitling Plaintiff to an award of punitive damages.

## JURY DEMAND

Plaintiff demands a trial by jury as to all issues so triable.

Date: July 27, 2020
New York, New York

Respectfully Submitted,

**DEREK SMITH LAW GROUP, PLLC**

BY: */s/ Daniel S. Kirschbaum*
Daniel S. Kirschbaum, Esq.
One Pennsylvania Plaza, Suite 4905
New York, New York 10119
(212) 587-0760

*Attorneys for Plaintiff*